Good morning. Please record my name is Lori Cooper and I'm representing Tadwaters in the Forest Conservation Council. This morning I will show that appellant's case did not have been dismissed by the district court on reach due to catagrounds. Because they were not... Oh, okay. I'm talking a little too silently. Is that better? I'll get a little closer. As I was saying, the district court should not have dismissed the appellant's case on this reach due to catagrounds because they were not in privity with another environmental group which had been involved in earlier litigation involving the same two timber sales. So actually this case is quite simple. It boils down to that issue. I will note that in my brief I did not argue one prong of reach due to cata, which is a final judgment on the merits. But I will note that subsequent authority, supplemental authority submitted to this court does discuss that. And this case is exactly on point. So I just note that for your honors to look at. I'll get right to these. There was a subsequent case decided by Judge Redden entitled Headwaters v. Forsgren, which involved the same plaintiff in my case, Headwaters, and involved the same earlier litigation called American Land Alliance v. Williams. That earlier litigation involved 19 timber sales. So these subsequent lawsuits are derivative in some ways of American Land Alliance because they challenge a subset of the timber sales that were in that big American Land Alliance case filed in 1999. And what happened in the later case? I'm afraid I don't have it. What happened in the later case, it was dismissed on reach due to catagrounds because the district court said the American Land Alliance case was the big first case. Can you say what happened in this case? I want to know what happened in the previous case. Oh, excuse me. Headwaters v. Forsgren? What happened in that case was Judge Redden found no privity between Headwaters and Klamath-Siskey Wildlands Center, which had been a plaintiff in the American Land Alliance case, the first big case. It's just a case that came out differently than this one, but you said something about final judgment. Oh, I'm sorry. In my briefs on this, I didn't address final judgment. I didn't think it was a strong issue, but Judge Redden apparently did, and plaintiffs in Headwaters v. Forsgren did brief that. And I just note to your honors that you may want to take a look at that case, which I did submit to the court in May of last year, May of 2002, for Judge Redden's analysis of why he did not believe there was final judgment on the merits in American Land Alliance because it was plaintiff's attorneys in that case stipulated for dismissal. Before there was even an answer filed by the government, there was no quid pro quo, and there was absolutely no briefing. So Judge Redden found that there could be no final judgment on the merits in that first case. And I apologize for the confusion there. I just thought I'd mention that because it could be important. I'll get to the third prong of race judicata, which is privity. The district court found that the Klamath-Siskey Wildlands Center and my clients, Headwaters and Forest Conservation Council, were in privity because the stated interests of the appellants, my clients, were represented and protected in prior litigation. And then the second thing Judge Redden said was that since I had represented Klamath-Siskey Wildlands Center in a second case, that that showed evidence of privity. And I will show you why that is absolutely not true. As I mentioned to you, the district court dismissed the Klamath lawsuit sua sponte, without any briefing from the parties and without making any factual findings. And as Judge Redden held in the Headwaters v. Forest Green case, the American Land Alliance case, which this whole case hinges on, had never been adjudicated. There was no final judgment on the merits, no briefing. So there's no way that my client's interests could have been protected. I don't think Judge Redden said it was not settled. There was a stipulation for dismissal. I say it was not settled. There's no settlement agreement. Because there's no settlement agreement, there's no evidence that the sides gave up anything. All that happened was the plaintiffs dropped their lawsuit. There's no evidence as to why that happened. So what was the order that was entered? The order that was entered is in the excerpts of record. It's just that it was stipulated for dismissal. Both sides stipulated for dismissal. Case was dismissed. No reason given. Say that again. Both sides entered stipulations for dismissal, and the case was dismissed. And there's no reason given for why that case was dismissed. Does it have to be a reason given when you stipulate? No, I don't think that necessarily does. But it goes to the analysis that my client's interests were not adequately represented during that first case, since there was no briefing, no argument on the merits. Isn't the question of representation in this context really a question of whether, as the Richards case suggests, whether those people were representing you? It isn't whether they did it well or badly, but were you something, an entity that was being represented there? That is true, Your Honor. Adequate representation doesn't refer to what we normally think of as adequate representation as far as competency. But there have, and I apologize I don't have the exact site, but I think Richards did say that when, I'm losing my train of thought, when there's no notice, there's a stronger, you need to make a stronger showing of adequacy of representation. And there was no notice to my client that that earlier litigation had been taken. Was there any indication that the people, that the parties in that case, thought they were representing anybody but themselves? No, there's absolutely no indication. And the only reason Judge Hogan at the district court level found that was that Clemson City Well and Center and Headwaters shared the same attorney, which was myself, in two subsequent cases, long after that American Land Alliance case in 1999. So there's no evidence that Headwaters and Forest Conservation Council, the plaintiffs that issued an incident case, had anything to do with the American Land Alliance case. The only similarity is that they're all environmental groups. Does that make a difference in the analysis, whether it's the public as opposed to a private right? Well, I know the government brings that up in their brief, Your Honor, and I would submit that this circuit has never held such a thing. The only reason that, the only case that this circuit has discussed that is Skavish v. Office of Independent Counsel, which is cited in my brief. And in that case, the circuit held that there should be no privity because the plaintiffs in the two cases, in that case, only shared an abstract interest in enforcement of public law. And that's what we have at issue here, is enforcement of environmental laws. Well, more than that, you had to, I assume because the case was submitted, it was dismissed at the stage it was, there hasn't been a standing committee. That's exactly correct. But presumably, you're not going to be able to go anyplace with the case unless you demonstrate that you, it isn't a public case in the sense that you need to be able to show a particularized injury offense. That's correct. For your particular client. And so the notion of a public case versus a private case is a little, I guess my question is what does it mean in a context in which you need to establish standing in any event? Well, that's a good question, Your Honor. I've been struggling with that. But I think how I look at it is looking at the logical outcome of such a holding. And that would require that all environmental groups have, you know, omniscient knowledge of all the litigation that's going on and keep track of it and make sure their interests are represented. Make sure, in this case, for instance, the American Lands Alliance plaintiffs were a conglomeration of grass roots environmental groups. I hate to use the word, but not sophisticated in the way of litigation, as headwaters and forest conservation. And moreover, for all in one knows, they could be complete frauds. It's certainly possible to imagine a situation in which there is actual collusion. Oh, certainly. There's certainly. Not collusion, but somebody found the case and doesn't really want to win it. Right. Exactly. People could play all kinds of games with that. On the other side, could you have a success of environmental groups that have won the first time and another one comes along and deliberates, then they can open over and over. That's true. And if the district court had found any evidence of such, you know, deliberate maneuvering, as the government says in their brief, then I wouldn't have a very strong argument. So, in this instance, since this was all done sort of spontaneously and without a record, I assume the government could attempt to make a record. Yes. And plaintiffs could attempt to make a record. In the headwaters versus forest grant case, where Judge Rudin held opposite to what Judge Hogan held in my case, there was, he did give them a chance to create a record, and there was an affidavit submitted by a headwaters employee saying that there was absolutely no involvement by headwaters in the American Land Alliance case. And there could have been. Headwaters was down to one staff person. They had undergone severe financial difficulties. There was just no, there was no evidence of collusion. Now, if there had been evidence of a meeting, a litigation committee meeting of these various environmental groups in Oregon or something to that effect, then I could see that a holding of collusion or signing of collusion could stand, but there's absolutely no evidence besides the fact that the same lawyer represented two of the groups in some subsequent litigation. Was the other case appealed or was it not concluded yet? The other case being... Judge Rudin's case. No, it was appealed, but unfortunately, the whole sale was lost very quickly before it could have reached the end circuit. The Judge Rudin's case, which involved a different timber sale, his holding on this race judicata was opposite to Judge Hogan's holding. And that sale was going to be, that lawsuit was going to be appealed to the Ninth Circuit because on the merits of the case, Judge Rudin ruled that the environmental groups didn't have any, didn't win. So, but it was lost before it could be appealed to the Ninth Circuit. Thank you. We'll give you a minute, Rebecca. Thank you very much. Good morning, Your Honors. May it please the Court. My name is Todd Agard. I'm here representing the Forest Service. Race judicata bars this suit because the accounts are in privity with the claim of Siskiyou Wildland Center. And I want to go straight to the issue that I think this case revolves around, and that is the deliberate maneuvering that occurred here. There was deliberate maneuvering, and there was sufficient evidence in the record for the judge to find deliberate maneuvering and support his dismissal of this case. First, though, the case law is absolutely clear, and I think appellants have essentially conceded this morning that where there is deliberate maneuvering to avoid the race judicata effects of an earlier judgment, that is a factor that can support the finding of privity between two parties. Doesn't it have to be some relationship between those parties at the time of the original case? It depends on what the deliberate maneuvering here is, and I want to be very clear. It doesn't matter if there's later deliberate maneuvering if, in fact, at the time of the original lawsuit, the entity had no opportunity to control, intervene, or otherwise have any people be represented in that case. Because the party, the new party that comes in, does not forfeit its right to bring a successive suit until the deliberate maneuvering occurs. So what's the deliberate maneuvering? The deliberate maneuvering here is that you have a lawsuit that was filed and dismissed for race judicata grounds, that's Clamiscus View, Wild Mountain. Three days later, the same complaint is filed with a different plaintiff named. But that's because it may have been race judicata as to the first person, not as to the second person. What does that prove? It proves that it shows that there is deliberate maneuvering here to avoid the race judicata effect. No, it proves that the first person was in fact a part of the first case. It was represented in the second lawsuit. I don't... No? No, it doesn't prove that. Well, that is a fact. So why is it maneuvering? I mean, what you're suggesting is that if you've made a record, which you don't have... No, no. If I could just bring... There is a record here. I mean, the plaintiffs in their excerpts of record have submitted all the relevant documents from the other cases. And so there was a record here on which the district court made it. There are two possible scenarios, and I'm not sure it matters which they were. Okay. But one of them is that the case is dismissed on race judicata grounds, headquarters, nothing about it before, finds out about it then and says, oh, this is too bad, it would be nice, we really care about this. And not only that, but there happens to be a lawyer who's done all the work anyway, so we may as well get her to do it and we now can bring this lawsuit and represent our own interests. That's one. That doesn't seem to me to be deliberate maneuvering. The other possibility is that the original group, which was the Smiths, says, oh, now we have to go find someone else to bring this case and we will pay their lawyer and we will. Well, I don't think they need to pay their lawyer for it to be deliberate maneuvering. And I think if you look at the case law in which courts have applied this deliberate maneuvering concept, that's the Tyess case, the Pettit case, and the Johnson versus Nationwide business forms, they do not go as far as you say. And if you look at those cases, what those cases say is that when you have a litigant who is not – and they add new plaintiffs for the purpose of avoiding race judicata, that supports a finding of privity. And that is what the district court found happened here, and I suggest that the plaintiffs have not even denied that that is what happened here. They denied that they collaborated before they brought this suit, but they have not denied that they brought this suit as a deliberate attempt after Klamath-Pitskiu Wildland Center had their complaint dismissed to raise the same claims with the same complaint. Under this court's – this court has adopted the virtual representation doctrine in a number of cases, and this case is actually much narrower than those other cases that have applied the virtual representation doctrine, Padrina versus Chun, ICT versus Rainier, among other cases. This case is much narrower than that and falls directly from the established precedent that applies this concept of deliberate maneuvering. If you look at those three cases that I cited, Pettit, Tias, and Johnson versus Nationwide business forms, there is no basis to distinguish those cases from this case, and I don't think that the plaintiffs have even attempted to do so here. The underlying idea here is that, as the First Circuit identified in Gonzalez's case, is that when you have tactical maneuvering to avoid res judicata among parties that might otherwise be considered imprivity, they're trying to exploit their technical non-party status, and that undermines – that games the system and undermines all the principles that otherwise, under res judicata, make it difficult to apply res judicata to technical non-parties. So I think that the district court's analysis here is well within the established precedent. Well, first, the established precedent, from what I can tell, consists of one circuit case, one district case, and an appellate case from Illinois. That have actually applied – those are examples of cases where courts have found this virtual representation through deliberate maneuvering, but in a number of other cases, a number of circuit courts and lower courts have noted that deliberate maneuvering supports the finding of privity. For example, the Gonzalez case from the First Circuit that I just cited to the court. One thing that I briefly wanted to address was the plaintiffs raising this morning this Headwaters v. Forreston. As they admitted, that raises an entirely different issue, an entirely different element of res judicata, that they haven't raised in this appeal, and therefore, they've waived any claim as to that. If this court was going to proceed on that alternate issue that they never raised in their brief, I would at least suggest that we unilaterally – Did they also have this issue in it? But they – as Ms. Cooper specifically said this morning, she was raising Headwaters v. Forreston for – Matthew, does the other case represent a district court's opposite view on the same issue as the one in this case? There – yes, but that's not what Ms. Cooper was talking about this morning. She was openly talking about the issue of whether there was a final judgment. Yes, in that other – in that Headwaters v. Forreston, the district court also made a finding as to whether these two groups were in privity in an entirely different litigation, not in this litigation. And so I would submit that, you know, its factual finding – its finding that was a different judge making a different finding in a different case, that those groups were not in privity, has no bearing – But the only evidence Judge Hopin had here was that they had the same lawyer and the same complaint, and it was a few days later, but not a few days later than the case which was claimed to be race judicata. He had no connection between this case and the one that was claimed to be race judicata, right? No, he was basing his – he based his holding on the association between the second case and the third case, not the first case and the third case. That's right. There is no allegation by us, nor a finding by Judge Hopin. What you're actually claiming is that if the second case is race judicata, you have nothing. No, no, no. The deliberate maneuvering is the key. And the deliberate maneuvering occurred – Deliberate maneuvering as to what? As to the filing of this case. But not because there's any connection to the original case that you're claiming to be race judicata. Deliberate maneuvering has nothing to do – the deliberate maneuvering occurred in this case. We are not relying on – So what are they trying to avoid? You're saying they're trying to avoid the original case, but that's the only case we have here. That's race judicata. That's right. The second case, they – the second case was also an attempt to avoid race judicata, and they failed. So they filed the third case, which is – What's to say? They're completely different people. They are not completely different people because they are associating with each other for the – How do you know that? We know that – we know that – okay. I'll tell the Court why we know this, but at the very least, I would say, if this Court is going to find that there was – How does Judge Hogan know it, other than they had the same lawyer and a similar complaint, and they were also environmentalists? Because – well, I mean, first of all, it was literally the same complaint, not just the same complaint. It was the same complaint, but that was – I think Judge Hogan also, because he had been – he was the judge on the earlier case, I think he was intimately familiar with how that litigation had been run and how this litigation arose, and so I think we can give some credit to his perspective, which is different than this Court's somewhat more removed perspective, as to the association between those two cases. But just to be absolutely clear here, we have the first case, which resolved this issue through a stipulated dismissal of the claims. There was a subsequent attempt to bring the same claims by the same party. That failed on race-judicata grounds. At that point – and we can – we readily admit that it perhaps was only at that point that there was collaboration between the current parties in this case and Klamath-Fiske-U-Wildland Center to file – as essentially a nominal plaintiff, file Klamath-Fiske-U-Wildland Center's complaint and litigate what they had had. As I understand, your tone is saying, yes, if we vacate the case, you can go back and prove that up, but you haven't – but your – the notion of this collaboration at this point rests simply on the fact that they had the same lawyer and the same complaint. Well, as I said, I would also credit somewhat Judge Hogan's first-person perspective as the presiding judge in both cases. Was he the judge in the first American land case? That I don't remember. And he certainly wasn't relying on any finding of collaboration with respect to that case. And so what I'm pointing to is that in being able to understand the relationship between the second and the third case, I think – Has any court ever decided whether the lawyer had authority to dismiss with prejudice? Actually, that was raised. What happened is, after the second case was dismissed for race to Dakota grounds, Klamath-Fiske-U-Wildland Center actually went back in the original case and filed a motion to vacate the judgment in that case for the ground that you stated. Rule 60B. Right. And then they subsequently actually withdrew that motion. So that's never been decided. No, because they withdrew that motion. Once again, I would just point this court to the closing paragraph in Judge Hogan's opinion and try and understand his position. He knew exactly what was going on here. And he stated very – Was there any difference when he did this to Estante and did not allow anybody to make a record? It matters only insofar as, if he did so with an insufficient record, the answer is to go back and ask him to develop a further record. And the problem with the judgment, you don't usually allow – if judges know something because something happened in their courtroom and it's on a record, that's one thing. But if judges know something because they think they know it and there's no way for us to review it, that is not usually the way courts operate. I would suggest that the record that has been proffered in this case of the pleadings and the judgments and the opinions in the three litigations is sufficient grounds to support Judge Hogan's opinion. I'm just asking this court to recognize that he has a somewhat more immediate perspective and first-person perspective. And there was no doubt that he was angry and he didn't want to see his face again. But that's another question. Thank you very much. Thank you. Thank you. I just want to quickly talk about the deliberate maneuvering aspect that the government raises. And I think your Honor just recognized that it's on a very thin thread, and that is that the same order was shared by the two groups in some later lawsuits. But in order to have a deliberate maneuvering, you'd need to have some sort of express or implied legal relationship. And that's what's required to find that a prior litigant had adequately represented and protected a later plaintiff's interest. Maybe it doesn't. I mean, it's clear there needs to be a legal relationship. Maybe it could simply be a group of people get together and say, you know, we all have a similar interest, and we're going to forward our interest in court in this way. One of us is going to file a lawsuit, and the other one is going to file a lawsuit, and so on. I don't know whether that would suffice. Well, it's not very clear from the case law. But I think that could be something called an implied legal relationship. You're asking, acting as each other's representatives in that case. So that would be an implied legal relationship. The land case was not appealed for. There was a 60-D notion made. Yes, I did that, yes. The basis of the 60-D notion was what? Was, I can't remember exactly how I worded it, but it was inadequate representation in the American Land Alliance case. There were two very inexperienced lawyers who did not communicate with their clients in the American Land Alliance case and dismissed, stipulated to dismiss with prejudice without explaining to the clients what with prejudice means, that you can never come back to court. That would seem to be a key thing, but you went through that. Yes, I went through that motion because trying to track down the lawyer in that first case was next to impossible. He was not returning anybody's calls. We had no affidavit from the record to show, and I just thought we would just. This wasn't in the other case anyway. Right, right, right. Were you an intervener in that other case? No. No, we weren't. There was no knowledge of that other case. Well, the thing that appears to me is that if that's the key issue as to why Grace Takata was, in quote, improper in the climate case, then that issue should have been raised then. It should have been, why not proceed with the 60-D motion? You didn't have to trace down any attorneys. Well, there was really no. You were faced with the question that that issue has never been raised. The judge then says, look, we've already decided it's Grace Takata from the American lands. There's no indication that that is wrong. And so now we're faced with a second complaint brought three days later that is under review to us, and that issue can't be preserved. I would have liked to preserve that issue, Your Honor, but my clients were, and I'll be honest, be panicked because these things happen very quickly, these timber sales, and it's only by pure luck that they haven't been cut yet. The current clients, in any event, would have had no role in that earlier. Right. The due process rights of my clients really dictate the fact that they should be able to bring their own separate lawsuit. If they had gone into that other case and tried to do anything. No. This is exactly the dilemma. If they had gone into that other case and tried to get a 60-D motion, presumably they would have been told they're not a part of this case. Goodbye. That's right. And really the first time my clients heard about either of the first two cases was exactly two days after the second case was dismissed by Judge Hogan, and it was not deliberate maneuvering. It was more a case of chickens running around with their heads cut off trying to find somebody with standing. Who has standing on this case? And the Forest Conservation Council heard about it through the Environmental Grapevine, and they had appealed the timber sales on economic grounds, so they have totally different interests from the other clients, and that's another thing. I just think that the reasons for finding res judicata, which is judicial efficiency and finality, the government or the defendants being able to rely on the finality of earlier judgment, just are not met in this case. There was no claim of judicial. I mean, the case has never gone through the merits, so it's not like we've spent years on litigation and gotten a final judgment and are running back to court. We just want to get to the merits of this case and get the allegations of the government's violation of environmental laws decided. My clients, Forest Conservation Council and Headwaters. But they were not concerned with this case, the earlier cases. Well, that's an interesting point. They were probably concerned, but as I indicated, they were down to one staff person. She was trying to hold the organization together and write new grants to get some money, so they were in no position to hire a lawyer or even participate in meetings with other groups or anything like that. There was just – there's absolutely no evidence, and I think if this court remands back to district court an evidentiary hearing or affidavits or depositions or whatever we do, we'll adequately show that. On whether there was any deliberate maneuvering or if there's any privity between my clients and the former litigants. Thank you very much, Ms. Robinson. The case of Headwaters v. United States Forest Service is admitted. We will now call the case of Longworth v. United States. Thank you. Next, please, the court. My name's Anne Murphy, and I'm here to represent the individual INS defendants in this case. Your Honor, we have two components to this appeal, and we have different arguments relating to each one, and I think it's very important that we not have bleed between those two. One set of the plaintiff's constitutional claims relates to or seems to relate to the INS defendant's decision to put her in expedited removal and to remove her from the United States. There's a separate and distinct set that relates to allegations concerning Nicole's treatment while she's in detention at the Multnomah Detention Center. And with regard to the detention claims, our arguments are that basically Ms. Wong sued the wrong defendants, that the people who were responsible for processing her INS claims had nothing to do with detention conditions, had no knowledge, should have had no knowledge, were not responsible. So, you know, particularly bearing in mind Anne Murphy's argument, I really want to make plain to the court that we're not raising jurisdictional bias. We're not raising Schreiber v. Chalicki with respect to the detention claims. Now, we are raising those with respect to the claims based on the immigration, Your Honor, because what happened in this case was that the INS defendants, and plaintiffs don't really challenge this, simply did what they had to do and what Congress had told them that they had to do and what the regulations told them they had to do under the INA, under provisions that apply equally to everybody regardless of where they come from and regardless of where they're being removed to. And it's our view that that doesn't violate the Constitution and that even if there were a statutory or constitutional problem, the defendants would have qualified immunity because they're simply following the law and the law is generally that if you're doing what you're required to do, you're entitled to rest on the constitutional judgment of the Congress or the administration. We also have some arguments based on Congress's obvious desire to limit judicial review in these particular types of claims for inadmissible aliens. The fact that Congress in Section 1252E provided certain avenues of judicial review for these claims. The whole subsection dedicated to judicial review from expedited orders of removal and that when Congress has been so plain and so specific about what types of claims it wants to allow, that it's not appropriate for the court to come in and then imply a remedy based on the Constitution against the individual people who are doing what Congress asked them to do. Let's see, this is enormously complicated. I want to see if I can sort out at least some of how I'm seeing this and get to where I think are the hard issues. One of your claims is that you couldn't have a bit of causative action here on a Schweiker kind of theory. Can you tell me, do you still believe that that's probably the force of this interlocutory appeal? Yes, I believe it is. And mostly because of the policy balancing here. The reason that we even have this interlocutory appeal is that if a claim is truly meritless, if there's no set of facts that can be pleaded that are consistent with the allegations, then the individual defendant should not have to go through discovery. And there are a number of Supreme Court cases that say this is really an important issue. But in general, we don't have interlocutory appeals, even in Bivens in 1983 cases, except with respect to the qualified immunity question. And this is not a qualified immunity question, is it? That's correct. But we do put independent appellate jurisdiction, which this Court has recognized and applied in several cases. But it's not the same issue. I'm just saying where I'm coming from. Right, but the idea is... You're a fairly weak crowd in saying that that issue should be decided now. I disagree on it. And the reason is this, that the cases say if you have a proper qualified immunity appeal, which we definitely do here. We have plenty of issues that are here. Then the Court can, when it's appropriate and proper, and I think it is, look out and consider other things that are really significant. But we're taking that fairly narrowly. I'm just trying to move some things off. No, I understand. I don't think you should move this one off. This is one of the ones that definitely does not get shunted off. And the reason is that if Congress has barred the claim, like, for example, in 1252G, if Congress said no Court shall have jurisdiction over this type of claim at all, then that's definitely... No, wait, wait, wait. Let me add two things up. Let me add two things up. What Congress has said, I was not including in what I said the 1252 set of issues. Correct. In Congress, the jurisdiction strip information. I was just talking about the judgment law with respect to what they've been talking about. Then the next thing we have is the congressional determinations, which are jurisdictional determinations, which may well be appropriate here. Right. Then we have, but as to those, we have the question of, you say the lawyers were just, the INF people were just doing what they were supposed to do, but the allegation is that they were doing something unconstitutional. Yes, but, Your Honor, you have to, I mean, you can't just say they did what they were doing, but it was unconstitutional, which is pretty much, but there's no challenge to the fact that the NRA required them to do the things that they did. But there's a challenge to the notion that they can't do it on racial and religious grounds. That's right, but we have to... It's a bare bones complaint. There's nothing in it. Right, Your Honor, we know. It's only possible that there's going to be nothing in it when you get back to court, if you ever come back. Right. But, Your Honor, our point is that, our point is that whatever they said, it wouldn't be enough, because the Supreme Court has very clearly held, with respect to these immigration decisions, that you don't have a constitutional right if you're an arriving alien at the border. The United States being there is a big, big case. A man who's lived in Buffalo for 25 years, leaves, has no authorized parole, has no right to get back, and is stranded on Ellis Island. The Supreme Court says, we know you were here before, but, alas, you're now an arriving alien at the border. You cannot bring a constitutional challenge to the conditions under which you're being removed. And this court's decision in Lee v. Eddy is the same thing. This is a very narrow class of cases. This is people who are technically and legally... Sorry? No, not that one. I think it was the... Oh. Sorry. This one that you just took on, but this is a different one. This one is from 259, I said, 1132. And you said here that the alien has no constitutional due process right to challenge her immigration status or to petition for entry because she's a non-resident alien seeking entry at the border. And that's exactly what we have here. This is not... You know, the cases that the plaintiff relies on are cases that involve permanent resident aliens. In the Chu case, the permanent resident alien got on a boat and never got off it before he got back to the United States. This is a very different class of alien. And that's really important here. Considering that at this stage, the only ones I'm familiar with where we have taken some sort of jurisdiction is where there was a summary judgment with factual matters that were alleged, affidavits and so forth. Here it's at the thinking stage, and you're wanting us to take supplemental jurisdiction as to matters that really don't concern the community. But, Your Honor, the question of her status and whether she has a right to bring this constitutional claim goes directly to whether or not these individual INS officers, by doing what they were supposed to do, violated the Constitution. And the claim seems to be that even if, even assuming, and any future allegations would have to be consistent with what's in the complaint, and, you know, what's been briefed, it seems to be that even if you do exactly what you're supposed to do under a law that's mandatory, that applies to everybody, you can nonetheless violate the Constitution if you have a bad intent. You have taken things that can also be divided into pieces, which is one is what sort of constitutional violation and technical should they have known there was. Right. The second may be much more in your favor than the first, perhaps. The first, well, all we know about the first so far is that the Reno case, whatever it's called, suggests that this is essentially a variety of a constitutional violation, right? Exactly. The case is almost never, but not never. Let me just read a little bit from that case. Well, an alien's continuing presence in this country is in violation of the immigration laws. The government does not offend the Constitution by deporting him for the additional reason it believes him to be a member of a particular organization. Do you think that the INS decided that they were going to deport all people who have black skins and that that case would hold up? No, of course not, because this is a different category of aliens and they have different rights. Because the issue here is about an arriving alien who's arrived. Deportable people. Or they weren't going to let people in. They were going to treat people in this one situation one way if they had black skins and another way if they had white skins. When you're talking about it, I think that the INA itself requires equal treatment. I believe it's a provision that requires that, so that would be a violation of the law. You'd have to look at the scheme that Congress set up and the things that the Supreme Court has said. And the things that the Supreme Court has said about arriving aliens and their right to bring certain types of challenges is very clear. Obviously, you're raising a horrible prospect, which we all hope wouldn't happen, but the fact of the matter is that if Congress has told the INS to do certain things, and they do them, then they shouldn't be liable in individual damages. I mean, ordinarily, we get sued, you know, if there's an allegation that people did something wrong. Here, there's really no allegation. The allegation is that this particular alien asked for special arrangements. The allegation is that it was done because of her rights. Now, that may be totally wrong, but that's the allegation. But, you know, is that a constitutional violation? And do you violate the constitution? Given AADC and given Lizzie Eddy and all these other things, do you violate the constitution? You bring basically a selective prosecution claim by alleging no wrongdoing, complete conformity with the law in every respect, and just saying, barely, off the top of your head, you did it with wrongful intent. I mean, I don't understand how that can, you know, get individual defendants into defending a lawsuit and going through discovery and all of that, because, frankly, we're here on every single alien who was ever deported to bring the case. If that were not a question of qualified immunity, you couldn't bring these matters before us at this time, could you? No, Your Honor. We're here on a qualified immunity case. This is only because it's attached to a qualified immunity matter. Well, Your Honor, let's get to the heart of the qualified immunity, then, whether it's a constitutional violation. It's a part of cases, too. And, you know, we have 54B, we have the other methods by which an officiary appeal can be brought. But we have discretion, do we not, as to whether to take this question as part of the qualified immunity? Your Honor, it's my fault. I'm not entirely clear which question you're referring to. I think you plainly have before you. Any supplemental jurisdiction that you're bringing before us, that's discretionary with this court as to whether or not to decide those issues. Yes, Your Honor, but I don't believe that. I think there's an awful lot here of core stuff that is not supplemental at all, that goes to whether or not a constitutional violation has been alleged, and also whether, under these circumstances, you can possibly say that these defendants are not entitled to qualified immunity. This is not the whole court, Your Honor. It's helpful to get off the table. Under, the Supreme Court has now told us again that completely conclusive allegations of discrimination are all right. Well, you're putting them both short of it. So, that's another issue that you raised that seems to me, is not only off the table, but sort of related to what we're talking about now. You put forth a motion for a more definite statement with regards to where are we getting this notion that there was racial discrimination. It might have just evaporated at that point, but that isn't what you did. You came here instead. Right, Your Honor, but the Supreme Court also said in Shkorpovitz, and the Supreme Court also said, not only in that case, but also in Crawford L., and somehow we have to admit Crawford L. was Shkorpovitz, which I agree is not an easy thing to do. Crawford L. said, you know, all the things that we, you know, it's not exactly all the things we wanted, but it said a lot of things about the importance of protecting individual defendants when you have just an allegation of malice. It said, plainly, a bare allegation of malice is not enough to get you past the motion to dismiss. What about a bare allegation of racial and religious discrimination? That is fairly well known as a, I mean, it should be well known to the defendants, or they can't claim qualified immunity on the idea of the new novel. But, Your Honor, you have to take a little bit of a step back and say, can you make that allegation under circumstances in which what you are alleging is that, and you're not disputing this is what you're alleging, is that government officials did what they were supposed to do under socially neutral law that applies to everybody. I mean, how would you ever know? First of all, when I gave you the hypothetical, you said, maybe. I.e., if there was a policy of treating, of selectively going after people on the basis of race. No, Your Honor. You asked me, could the INS run around and deport everybody because of race? And the answer was, you know. But even if they were otherwise supportable, even if they were doing what they're supposed to do. Right. But, Your Honor, what we have, and what I tried to point out, is we have here the very, very narrow class. And I really commend that you look at Mazzei and look at Lizzie Eddy and look at Zazie Das. By the way, it hasn't vacated its movement. I'm afraid you're not aware of that. No, I'm very sorry. But it correctly stated the law anyway. We should look, you know, if you want supplemental briefing on the status of inadmissible aliens who have not entered the country yet, which is Ms. Wong's legal status. With regard to that particular class of people, the Supreme Court has said, you know, this is a huge potential class, and they don't have a right to come and raise constitutional challenges regarding their immigration status. So if you want to hit me with this terrible hypothetical, oh, you know, could you send them all back if they were black, the answer would be no. To the way you were articulating it. Right. Because any selective prosecution allegation involves people who are doing what they're supposed to do in the sentence. Exactly. And that's why this is one of those cases. And so the question is, given that she's an inadmissible alien, is this enough? In the context of a suit where you have individual INS defendants where Congress has expressly barred certain types of claims and where they were simply doing what they were supposed to do, is it enough to get you into discovery and subjecting them to the processes of discovery to simply allege a lot of facts and then say, oh, by the way, they did it all with a discriminatory intent? And it's argued that, I mean, partly because of this notion that really any alien could do that. You know, any single person who's gone through a removal process, it just seems that it can't be enough and that Congress wouldn't have intended it to be that way. And I'm going to step up so I can have a little time to reflect on this. May it please the Court, I'm Dan Tewksbury, on behalf of the plaintiffs, Apple Reed, Kwai Fun Wong, and the Uwe Gendau Association. I think the facts of this case have been lost in the sort of heady legal analysis that's been going on. The facts are that Kwai Fun Wong lived lawfully in the country here for in excess of six years under a religious worker visa. During the time of her residence here, she became the designated inheritor of the sacred Tao. And she, upon the death of her predecessor, Kwan Ren, was suddenly, the sudden death, was suddenly required to accompany his body back to China, Hong Kong, which is now China, to take care of the matters involving his burial and the matters of administrating, suddenly, the worldwide religious organization of which she had suddenly become the head. So the press of her religious duties is something that we ask the Court not to overlook. In going beyond what the government concedes is a viable Bivens claim within the context of her mistreatment in detention. Now, as the Court has pointed out... I'm not exactly conceding that either, but I think... Well, my understanding is that the jurisdictional bar of 1252 would not apply to that particular. In any event, we don't believe that the merits of the Bivens claim are properly before the Court today on interlocutory appeal. And I cite to a very recent case out of this Court, Miranda v. Kitzhaber. My site is 328 Fed Third, 1181, May 14, 2003. And in that case, we had an Eleventh Amendment sovereign immunity argument made on interlocutory appeal from a, I believe it was a denial of a motion to dismiss. And the State attempted to bring into that interlocutory appeal the merits of the underlying Section 1983 claim, which is, of course, the state and local government equivalent of the Bivens claim. And the Court, this Court, refused to exercise pendent pallet jurisdiction. It would be helpful if you could be more specific, again, because this is so complicated, but that is exactly what you think is properly here and not properly here. For example, are the allegations that the jurisdictional allegations, the jurisdiction-stripping allegations about what the INA says, about what cases can be reviewed, what issues can be reviewed in court at all, are those properly here now? Well, we don't think we have a 1252 problem. I know, but I questioned whether you have a 1252 problem. To the extent it touches upon, tries to touch upon, if they think the government has, the merits of the Bivens claims that we're bringing, no. Well, the merits of the Bivens claims that you're bringing are part of the Qualified Immunity Standard under SOCIA at some point, so to the degree we have to reach them for that purpose, then it would be appropriate to exercise that level of jurisdiction. But I think Mr. Hirsch for the Friend of the Court will be addressing that issue in greater detail, about the 1252 jurisdictional issues or other issues that are raised outside of what is, our position is the only thing that's properly before this Court is the Qualified Immunity, denial of Qualified Immunity at the pleading stage. Which includes the constitutional issue, because it necessarily does. Under SOCIA v. CATS, yes, the two issues under that. The question of whether this woman who was out of the country and coming back in has any cognizable constitutional rights under these circumstances is properly before us at this juncture. The two prongs of the SOCIA v. CATS analysis, yes, would be properly before this Court. And so that particular question that I just outlined therefore is before us. What rights she has. Yes, what category she's in. She could be considered an out-of-country person with no rights, or she could be considered an in-country person. Again, I go back to my analysis of the facts, my recitation of the facts, to look at that. I think the Court, if the Court will reach that determination here, and agree that that is probably part and parcel of a Qualified Immunity analysis, the Court has the ability to look at the facts in the allegations, in the complaints, to determine the extent of the constitutional protections to which Ms. Wong, living in this country, there is no suspicion or accusation of her engaging in any kind of criminal activity. This is, you know, a woman of God. That has to, I think, enter into the factual analysis. And the Shaughnessy v. Mazet case was distinguished by the District Court as not really applying because of the fact that she was, she didn't just go away and, like the plaintiff in Mazet, went away for a long time. Again, you have to look at the press of her religious obligations. She was not, this is more like Chu v. Holdings. The fact of her, irregardless of her immigration status, the technical status to which the INS would like to pigeonhole her, irrespective of the fact she's living here legally, lawfully, and productively in this country. Could you help me out on a point in the record? Was there any, are you making any claim that there was anything invidious about her failure to get permission to leave? A parole, a parole, advanced parole? The complaint alleges that there was a discriminatory animus underlying the decision of the district director to deny her advanced parole, yes. Was it denied or was it just neglected? That is, didn't have time to act on it? Was it handled in the ordinary course of business? At this point, we don't have sufficient discovery to be able to really say for sure what happened. And that's part of the point here. We don't have, for two years, we've had no discovery in this case. And that, I must say, is one of these cases in which you really want to know what really happened behind the complaint. Because, as I understand it, what you're, I understood you'd be saying in the complaint that you didn't actually formally apply for advanced parole, but you did make some sort of inquiry. And I can't quite, but I assume if you look case-by-case, somebody would explain why that was. The district court found, and it's in the record, I believe it's contained within the denial letter, which the government attached to it in support of its motion to dismiss, the district director's denial of the application for change of residency status, which was pending at the time her parole was revoked, when she re-entered the country after taking her predecessor's body back to China. The district court found that in the record, according to the district director's own statement in the letter of denial, that she had applied for advanced parole after she came back, when she could, when she had time, when there was an ability to do that. And so to that, again, there's no discovery. I can't say for sure. And I understand the court's frustration. But there are enough facts. But then you have, there's an allegation in the complaint that says that she applied for advanced, that she was denied advanced parole for discriminatory reasons. And that's prior, you know, in a sense, prior to her leaving the country. Do you know where that is in the complaint? Well, we also have a potential dispute about which complaint is at issue here. The district court found that that was, that was a place in which there was also an allegation of discriminatory that she had all the rights and privileges of the Constitution under the First, Fourth, and Fifth Amendment, as we've alleged. And the court can avoid all this problem, constitutional problem, by focusing on, if it wants, by focusing on the conditions of detention. And at the pleading stage, and as the government concedes in so many ways, that jurisdictional bar does not apply. And there was clearly established law at the time that she had a right to have her religiously mandated dietary requirements accommodated. And she had a right not to be subjected to blanket strip searches with no criminal activity even suspected. This is a woman who's taken a vow of chastity. She was subjected to two strip searches, including one orifice search. And as the district court correctly ruled, that was, that's unconstitutional. It's well established that she had a right not to be subjected to that. Now, these Duffy causation issues and so on are not properly before the court on this interlocutory appeal. And that analysis really requires a very intense view of the facts as they should be developed in discovery. But on the face of it, there's a viable constitutional claim. If not outside of and within the context of the conditions of detention to which she was subjected in the process, there is, let me just also reiterate that there is no allegation here at the district courthouse, there is no allegation of attempting, as the Reno plaintiffs were, attempting to invoke the court's jurisdiction regarding the removal of Ms. Wong. Yet they had a right to remove her once they did all these other things. We cannot seek review. We know 1252G denies the court the jurisdiction to review these discreet actions of the INS. And that's not what we're challenging. But as Your Honor pointed out during the government's argument, the ability to carry out, you know, to enforce the immigration laws does not include the ability to do so for discriminatory reason in violation of the Constitution. Under what authority? But I understood you to say that Mr. Hersh is going to discuss that. No? Oh, perhaps. Okay. Well, he's perhaps more better equipped to address that than I am. I'm just asking that the court realize that this does not raise the 1252 issue, if that issue is properly before the court. Well, tell me why not. If you want to talk about it, tell me why not. Because the discriminatory animus that motivated the actions is not part of those, it's not part of that process that is part of the removal process. It's not a decision to, we're not asking review of the decisions. We're asking for money damages for the constitutional injuries she suffered as a result of what happened to her, as a result of a discriminatory animus behind the decision-making process. So, in AADC, the plaintiffs were clearly trying to, they were trying to prolong and delay their deportation, and that's squarely within the jurisdictional bar of 1252G. Well, she does not have constitutional rights. She's a person just entering the country. She has basic constitutional rights. It has not been decided that she has no constitutional rights. That has never been a holding. There may be some restrictions on things such as entitlement to procedural due process, but no human being can be subjected to what essentially is an invasive body search without... I'm not talking about that. Okay. I'm talking about that she's in. But on the question I think that you're seeking to raise is that she was discriminated, as I understand your intention, she was discriminated against for religious or racial reasons when they denied this emergency ability to leave the court for various reasons. Therefore, she should be considered as though she was still a resident of six years. That's correct. So I would ask this court to apply the Chu versus Holding analysis to this case, not the Shaughnessy versus Mizey, as the district court has distinguished that case. And I'm going to cede the rest of my time to a friend of the court. Thank you very much. Thank you. May it please the court, Steve Hirsch from MECA-SecurEI, Lawyers Committee for Civil Rights of the Kansas County area. I want to talk about two things. First of all, what is before the court and why, and secondly, the substance of the 1252 issue. First, what's before the court? Obviously, qualified immunity is before the court. Secondly, I would say that any issue that really is about subject matter jurisdiction is inevitably before the court because that issue is always before the court when it decides anything. Now, under the category of actual subject matter jurisdiction issues, I think there is only 1252 and only insofar as we are not talking about the claim for conditions of detention because the government has conceded that 1252 doesn't apply there. Now, there has been sort of a pseudo-jurisdictional issue injected, which is the Schweiger v. Chalke issue or, as I prefer to call it, the detailed remedial scheme argument, which is that because there's some sort of a detailed remedial scheme under the INA governing expedited removal, therefore, there can be no Bivens action. That is not, in fact, a jurisdictional argument. I don't believe that's before the court because I don't think that's analytically so intertwined with the qualified immunity issue that it would survive this court's very, very restrictive precedence on pendent appellate jurisdiction. Now, as to the Schweiger issue, I just want to bolster what I think is the court's intuition on this by pointing to Davis v. Passman, which is one of the early Bivens cases. And at 442 U.S. 228 at page 239 and footnote 18, the court very carefully parses in the context of Bivens jurisprudence what is jurisdictional, what has to do with standing, what is about causes of action, and what is about remedies. And it makes quite clear that the only jurisdictional aspect of the Bivens jurisprudence is the simple fact that 28 U.S.C. 1331 gives courts jurisdiction to their constitutional claims. All the remaining subtleties and nuances of Bivens, including the Schweiger remedial scheme issue, go to much more subsidiary questions such as, is there a remedy? So that, in my view, is not before you today as a jurisdictional issue. Then the question becomes, is it before you as a pendant issue that is so inextricably intertwined? I'm going to cut you off because your time is very short. Yes. And you just said you were going to talk about 1252. I'd like to do that. This is my hard question on 1252. If we thought that any of these provisions applied, and the most likely one may be some version of 1252-G or perhaps 1252-H2-A, and we also thought that there was a culpable constitutional claim raised, what would we do then? I.e., is there a problem? Do these provisions cut off constitutional claims? And would it be construed as opposed not to cut off constitutional claims, or would it be answered on the issue that was ultimately raised in Lefter v. Dole? What would we do? Well, let me try to answer that. First, can I just look at the two provisions separately? First of all, I think under Reno v. AABC, 1252-G really isn't an issue here because it only goes to the three discrete acts of connecting proceedings, adjudicating cases, and executing removal orders. And I don't think that's the issue here. So that leaves us with 1252-A2. I would suggest that that provision does not apply to claims that have no potential to delay or prolong a removal proceeding. That is to say, I don't think it applies to Bivens claims. And let me adduce several pieces of evidence for that view. First of all, in Papa v. U.S., this Court approved a Bivens claim by the children of an alien who was murdered in detention, and that claim was filed in 1998 after IRIRA, and there was no discussion of jurisdiction stripping in there. So there's at least an implication from that. Which case is that? Papa v. U.S., 281 F. 3rd, 1004. Secondly, we know from the Stantzer decision that the phrase jurisdiction to review is something of a term of art, and it does not extend to everything that a court can do. For instance, as held in Stantzer, it does not extend to habeas review. So what does it extend to? I think we should take a cue here from the Reno v. AADC decision, which albeit it was discussing 1252G, made the statement that this provision is, quote, Well, I think that's very arguably what 1252A2 is also aimed at. And it's obvious that Bivens claims, which are brought after the proceedings are over, and in this case certainly after the alien has been removed, have no potential for deconstructing, fragmenting, or prolonging removal proceedings. Another piece of evidence... Over time, I'll give you one more minute. Finally, if there's any ambiguity or any doubt, I would say, about this reading of the statute, I would urge the court to apply the interpretive rule that ambiguity in removal statutes is resolved in the alien's favor, which is a proposition that this court wrote about quite recently in Alvarez-Santos v. INS, which was authored by Judge Berzon and was issued on June 20th. Okay. Thank you. Thank you very much. Thanks, James. I have a couple of quick things. First of all, each of your honors is concentrated on the advanced parole issue and the claims surrounding Ms. Wong's decision not to seek advanced parole. I can only beg, please, that you look very carefully at paragraph 14 of the complaint. That's page 30 of the excerpt of the record. It makes very plain that Ms. Wong did not apply for advanced parole, but she telethoned the INS and said, can we make some special arrangements here? To which they said, no. Don't forget, this is a procedure that's designed to allow people to leave on an expedited emergency basis. It's a very simple procedure. There are forms you need to fill out. There are things you need to do, and the reason is that if there's been a delay in adjusting your status, you've kind of fallen out of status in the U.S., but obviously since it's the INS's problem, they're not going to do anything. However, if you leave, it's to your benefit to get the piece of paper that says, even though I have no status, I can still come in and I'll get back my original status. So the whole procedure is designed to be very quick, very easy. It's designed for people going to funerals. And that's in the record, either. Yeah, that's, I mean, that you can take the initial notice of. It's in regulations. You go and you look on the website, and it tells you, A, you must do this. You must protect yourself. B, you can't do this. Well, you have to show up. You have to have your form. You have to have your fee, and you have to say you have an emergent reason. But anyway, so I just really want you to look carefully at that. And I have one other thing that I really want to make sure. Your Honor, you suggested that our position was that an arising alien has no constitutional rights, and I'm on board with them here. I'm certainly not asking you to hold that in this case. I don't think it's presented. The issue here is, does an arising alien have a constitutional right to challenge her immigration status or decisions made about her immigration status on basically a selective enforcement claim? Much, much, much narrower question. I think the answer is very plain from the cases. So I'm sorry, Honor. Can I answer your question? I, there is, as the spooks very noted, a confusion about what complaint we're dealing with, and that could make a difference as to the detention issues. So, or at least my question is, could it make a difference with respect to detention issues? And suppose we took the second one, the one where there were allegations and they knew and should have known. Would that be sufficient, or you would argue it was still not sufficient? Well, we would argue first that you can't do that because it was purportedly filed after. I know there's some debate about what the magistrate does there, but anyway. But we would take- Just a minute. Well, you can do it with him too. I mean, in general, we have a lot of firm law that you don't dismiss cases if they could be amended. That's right. And part of our position is that there's really, I mean, part of the reason we're here at this procedural stage is there's really nothing you can do to this complaint consistently with the existing allegations that will help prop it up. I think we have the same argument with respect to the knew or should have known, which is that a conclusory allegation about somebody's state of mind or what they should have known is inconsistent with all the facts in the record, which is that these were the INS detentions, the INS people who, I mean, the allegations are things like they signed notices or all they were doing was processing her immigration request. They're not responsible for INS detention. They're not in that branch of the INS. There's no reason that they should even know where she was going, let alone what the conditions would be there. And ResNIC in those cases make it very clear that if you're in a detention situation, you need to invoke the facility's own procedures and make requests. And there's no, I mean, it's very clear. Your position boils down to the INS can essentially subcontract with detention facilities and has no responsibility for those on board. Well, that's not actually, nowadays the INS has some procedures that it imposes, nationwide procedures that it imposes on its facilities. At the time of the events in suit here, those were not in place. And in particular relevance is now a search procedure, which, by the way, if you go on the Internet and you look at it, don't have a cow, because it says, you know, we can strip search people, but there's a subsidiary one that it relates to which requires reasonable suspicion. So I'm just doing that just in case somebody's doing some research and is shocked. But there are detention procedures. But, again, part of that involves grievance procedures. It involves the lines of authority for who's responsible for INS detention. And our position is these are just the people who process the immigration. My position is that there's no linkage between these particular people and the detention. There might be somebody else who would be responsible. The INS general might be responsible for these particular people. They're not adequate allegations to show that they're responsible. Exactly. Thank you very much. Thank you.
judges: Goodwin, Hug, Berzon